David H. Madden
Mersenne Law LLC
1500 S.W. First Avenue
Suite 1170
Portland, Oregon 97201
(503)679-1671
dhm@mersenne.com
Attorney for Defendants David HAVLICEK and
Mary HAVLICEK

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **VOLTAGE PICTURES, LLC**, <br>     Plaintiff, <br><br>       *v.* <br><br> **DOEs 1 – 321,** <br> **David HAVLICEK** aka **DOE 322,** <br> **Mary HAVLICEK** and <br> **DOEs 323 – 371**, <br>     Defendants <br> ──────────────────── <br> **David HAVLICEK** aka **DOE 322** and <br> **Mary HAVLICEK** <br>     Cross-plaintiffs, <br><br>       *v.* <br><br> **VOLTAGE PICTURES LLC**, <br> **MAXCON PRODCUTIONS INC.** and <br> **ACMEs 1-25**, <br>     Cross-defendants | Civil Action No.: ............ 3:13-CV-00295-AA <br><br><br> **ANSWER AND CROSS-COMPLAINT** |

**FOR** their Answer and defense of the complaint of copyright infringement filed by VOLTAGE PICTURES LLC, defendants David HAVLICEK and Mary HAVLICEK (collectively, "the HAVLICEKs") admit, deny and allege as set forth below.  To the extent not specifically admitted or denied, the HAVLICEKs generally deny each and every allegation in the complaint.

1.      The HAVLICEKs lack information to admit or deny the truth of Plaintiff's allegations in paragraphs 1–8.  However, upon information and belief, the motion picture being sued upon in this case, *Maximum Conviction*, is not an Academy Award (Oscar) winner, and was not the recipient of numerous other recognitions.

9.      BitTorrent is the name of a computer program and a communication protocol for exchanging information among computers connected to the Internet.  The HAVLICEKs deny that any conclusion or inference about the illegality of an activity may properly be drawn based upon the use of this program and protocol.

10.     Neither David HAVLICEK nor Mary HAVLICEK nor anyone acting under their direction or with their explicit or implicit permission have participated in illegally copying or distributing plaintiff's motion picture via BitTorrent.

11.     The HAVLICEKs admit that this action, and their defenses and counterclaims, are founded upon the Copyright Act, 17 U.S.C. §§ 101 *et seq*.

12.     The HAVLICEKs admit that subject-matter jurisdiction properly lies with this Court.

13.     The HAVLICEKs admit that venue is properly in this district.

14.     The HAVLICEKs lack information to admit or deny the truth of plaintiff's claim to have used geolocation technology.  They deny the allegation that they

conducted any acts of copying plaintiffs work in this state, in this judicial district, or in any other location.

16. The HAVLICEKs lack information to admit or deny the plaintiff's claim of business entity form or location of principal offices.  They deny that VOLTAGE PICTURES LLC produced, marketed and/or distributed the motion picture entitled *Maximum Conviction*.

16. The HAVLICEKs admit that the motion picture *Maximum Conviction* is the subject of U.S. Copyright Registration No. PAu 3-647-070, which lists Maxcon Productions, Inc. as its author.

17. The HAVLICEKs lack information to admit or deny that the motion picture is wholly original or that it is copyrightable subject matter under the laws of the United States.

18. The HAVLICEKs admit that the motion picture is currently offered for sale in commerce.  A DVD copy of the motion picture may be purchased from Amazon, Inc. for $13.99 (or $9.99 for the two-disc Blu-Ray version).

19. The HAVLICEKs lack information to admit or deny that VOLTAGE PICTURES LLC has been assigned any rights in connection with the motion picture. Upon information and belief, VOLTAGE PICTURES does not possess the claimed rights.

20. The HAVLICEKs lack information to admit or deny that VOLTAGE PICTURES LLC is the proprietor of all right, title and interest in the motion picture, whether or not such interest includes the right to sue for past infringement.

21. The HAVLICEKs lack information to admit or deny that VOLTAGE PICTURES LLC possesses the exclusive right to reproduce the motion picture and to

*Answer and Cross-Complaint of David and Mary HAVLICEK*

distribute the motion picture to the public.  However, the HAVLICEKs are aware of another party, MAXCON PRODUCTIONS INC., which claims the identical right with respect to the same motion picture in a current proceeding in the U.S. District Court for the Southern District of Georgia (Savannah Division), case no. 4:13-CV-00038 (complaint attached as Exhibit A; see paragraphs 29–33.).  By logic and common legal principles, VOLTAGE PICTURES LLC and MAXCON PRODUCTIONS INC., cannot both possess the exclusive rights alleged.

22.     The HAVLICEKs lack information to admit or deny VOLTAGE PICTURES LLC's allegations regarding the nature of the motion picture, the professionalism of its creators or the quality of its production equipment.

23.     The HAVLICEKs had no notice of plaintiff's claimed rights.  They were unaware of the movie and have not seen it, its packaging, advertising, or any copyright notice associated with it.

24.     The HAVLICEKs deny that they used BitTorrent software or protocol for any purpose, including specifically for the purpose of copying or distributing plaintiff's motion picture.

25.     The HAVLICEKs deny paragraph 25.

26.     The HAVLICEKs deny paragraph 26.

27.     The HAVLICEKs lack information regarding plaintiff's purported identification of Doe defendants.  However, upon information and belief, Mary HAVLICEK was "identified" as a defendant merely because she called plaintiff's attorney to inquire about this action.  Plaintiff subsequently threatened her in writing with inclusion in this lawsuit based solely upon her inquiry.

*Answer and Cross-Complaint of David and Mary HAVLICEK*

28.     The HAVLICEKs lack information to admit or deny plaintiff's investigation of hash values.

29.     The HAVLICEKs lack information to admit or deny plaintiff's investigative techniques.  However, upon information and belief, plaintiff is now aware of the true names of many – if not all – DOE defendants.

30.     The HAVLICEKs deny that any person can be specifically and uniquely identified by means of an Internet Protocol or IP address.  IP addresses are assigned to computers, not to people.  The balance of paragraph 30 is generally denied as false or technically inaccurate.

31.     The HAVLICEKs lack information to admit or deny plaintiff's beliefs or intentions regarding the issuance of subpoenas.

32.     The HAVLICEKs deny that joinder is appropriate in this action.  Upon information and belief, the DOE defendants were joined solely to avoid paying proper filing fees.  However, there *are* common questions of law and fact that should be resolved in this case prior to severing individual defendants.  For example, if plaintiff actually lacks the rights it alleges that it holds in paragraphs 19–21 , then *no* defendant is liable to it, and the action must be dismissed with prejudice.  Judicial economy counsels for the determination of such predicate questions before dismissal or severance.

33.     The HAVLICEKs deny the allegations of paragraph 33.

34.     The HAVLICEKs deny that plaintiff has any right to relief.

35.     The HAVLICEKs admit that this action raises some substantial questions of law and fact common to all defendants.

36.     The HAVLICEKs admit that joinder is presently appropriate to permit more efficient management of plaintiff's claims and to reduce the burden on the Court.

37.     The HAVLICEKs acknowledge plaintiff's offer to dismiss and re-file individual cases.

38.     The HAVLICEKs lack information to admit or deny the allegations about other defendants' contracts with their Internet Service Provider ("ISP").

39.     The HAVLICEKs deny that an ISP assigns an IP address to each user, or to any user at all.

40.     The HAVLICEKs admit that an IP address can sometimes be traced back to a specific ISP account holder, but deny all other portions of paragraph 40.

41.     The HAVLICEKs lack information to admit or deny what terms are standard in any ISP service account.

42.     The HAVLICEKs admit that illegal activity on the Internet is commonly known.  They deny that such knowledge puts anyone on notice of the need to limit the use of his IP address in any way.

43.     The HAVLICEKs deny that either of them utilized any technology whatsoever to copy plaintiff's motion picture.

44.     The HAVLICEKs admit that some peer-to-peer networks permit users to upload, search and transfer files from computer to computer.

45.     The HAVLICEKs admit that plaintiff's allegations concern the BitTorrent peer-to-peer protocol.

46.     The HAVLICEKs deny ever using BitTorrent software or the BitTorrent protocol to transfer any computer information, including without limitation plaintiff's

*Answer and Cross-Complaint of David and Mary HAVLICEK*

copyrighted motion picture.

47.    The HAVLICEKs admit that a computer program implementing the BitTorrent protocol is required to participate in a BitTorrent peer-to-peer network.

48.    The HAVLICEKs lack information to admit or deny the capabilities of a typical BitTorrent client application.

49.    The HAVLICEKs lack information to admit or deny the characteristics or activities of "torrent site" websites.

50.    The HAVLICEKs admit that torrent files contain unique hash identifiers. They deny the balance of paragraph 50 as vague, irrelevant, technically inaccurate, or false.

51.    The HAVLICEKs lack information to admit or deny the descriptions of BitTorrent trackers, the BitTorrent protocol, the Distributed Hash Table and other technical matters.  Upon information and belief, the descriptions in paragraphs 51–60 are inaccurate and/or incorrect, and so they are generally denied.

61.    The HAVLICEKs lack information to admit or deny what information plaintiff has recorded.  They deny that plaintiff's investigator has downloaded the motion picture from each DOE, and specifically that the investigator downloaded the motion picture from any computer owned or operated by the HAVLICEKs.

62.    The HAVLICEKs deny any illegal conduct and any conduct in violation of their license and terms of access established with their ISP.

63.    The HAVLICEKs lack information to admit or deny whether zero, one or more BitTorrent swarms infringed plaintiff's copyright.  They deny participating in any such swarm.

*Answer and Cross-Complaint of David and Mary HAVLICEK*

64.     The HAVLICEKs deny uploading and sharing plaintiff's motion picture in a swarm or otherwise.

65.     The HAVLICEKs deny participating in any BitTorrent swarm.

66.     The HAVLICEKs deny participating in any transaction, occurrence, or series of occurrences with the other defendants or any of them.

67.     The HAVLICEKs deny acting in concert with others, including all other defendants, by participating in a Peer Exchange.

68.     The HAVLICEKs deny any use of a Distributed Hash Table.

69.     The HAVLICEKs deny any conduct comprising a collective enterprise.

70.     The HAVLICEKs lack information to confirm or deny the allegations regarding DOE #10 made in paragraphs 70 and 71.

72.     The HAVLICEKs deny that they performed any acts attributed to DOE #10, and any other uploading, copying or distributing of plaintiff's motion picture.


**Answer to First Claim**

73.     The HAVLICEKs repeat each and every one of the preceding admissions and denials above.

74.     The HAVLICEKs deny that plainitff's Exhibit 1 identifies any person who has distributed plaintiff's motion picture.

75.     The HAVLICEKs deny that they used BitTorrent software or any other software to download or distribute plaintiff's motion picture.

76.     The HAVLICEKs deny that any of their actions constitute infringement of any of plaintiff's exclusive rights under the Copyright Act.  They also deny that plaintiff

*Answer and Cross-Complaint of David and Mary HAVLICEK*

possesses any exclusive rights to the subject motion picture.

77.     The HAVLICEKs deny any conduct, whether or not willful or intentional, that is in disregard of plaintiff's rights.

78.     The HAVLICEKs deny that any of plaintiff's rights under 17 U.S.C. § 106 have been violated, and deny that any such violation was committed by them.

79.     The HAVLICEKs deny that plaintiff is entitled to damages or attorney fees or costs under any legal theory whatsoever.

80.     The HAVLICEKs deny any conduct that causes harm to plaintiff, except for their response to this lawsuit.

81.     The HAVLICEKs deny that plaintiff is entitled to injunctive relief against them for any reason whatsoever.


### Answer to Second Claim

82.     The HAVLICEKs repeat each and every one of the preceding admissions and denials above.

83.     The HAVLICEKs deny that plaintiff's Exhibit 1 identifies any person who may have infringed plaintiff's copyrights.

84.     The HAVLICEKs deny participating in any BitTorrent swarm, with or without other DOE defendants, and deny causing or materially contributing to any infringement of plaintiff's copyrights.

85.     The HAVLICEKs deny any conduct, whether or not willful or intentional, that is in disregard of plaintiff's rights.

86.     The HAVLICEKs deny that any of their conduct violates plaintiff's exclusive

*Answer and Cross-Complaint of David and Mary HAVLICEK*

rights under 17 U.S.C. § 106. They also deny that plaintiff possesses any exclusive rights under that section.

87.     The HAVLICEKs deny that plaintiff is entitled to damages or attorney fees or costs under any legal theory whatsoever.

88.     The HAVLICEKs deny any conduct that causes great and irreparable injury to plaintiff, except for their response to this lawsuit.

89.     The HAVLICEKs deny that plaintiff is entitled to injunctive relief against them for any reason whatsoever.

## Answer to Third Claim

90.     The HAVLICEKs repeat each and every one of the preceding admissions and denials above.

91.     The HAVLICEKs admit that they obtained Internet access through an ISP. They deny each and every other portion of paragraph 91.

92.     The HAVLICEKs deny any liability for indirect or secondary copyright infringement.

93.     The HAVLICEKs deny that they failed to take any required precaution against unauthorized use of their Internet connection.

94.     The HAVLICEKs deny any violation of law or license.

95.     The HAVLICEKs deny any conduct, whether or not willful or intentional, that is in disregard of plaintiff's rights.

96.     The HAVLICEKs deny that any of their conduct violates plaintiff's exclusive rights under 17 U.S.C. § 106. They also deny that plaintiff possesses any exclusive rights

under that section.

97.     The HAVLICEKs deny that plaintiff is entitled to damages or attorney fees or costs under any legal theory whatsoever.

98.     The HAVLICEKs deny any conduct that causes great and irreparable injury to plaintiff, except for their response to this lawsuit.

99.     The HAVLICEKs deny that plaintiff is entitled to injunctive relief against them for any reason whatsoever.

100.    The HAVLICEKs lack information to admit or deny that plaintiff has been damaged by $30,000 or by any other amount.  They deny that any damage plaintiff suffered was caused by their action or inaction.

## Defendants' Allegations

101.    Copyright trolling is a litigation scheme that has been perpetrated upon Internet users – both those who may be guilty of copyright infringement and those who are not – for several years.  This scheme harasses and oppresses Internet users, denies them practical recourse to the courts, lowers the public's opinion of lawyers, deprives courts of fees properly owed, and brings disrespect upon the judicial system.

102.    In a typical troll case, a plaintiff collects IP addresses from hundreds or thousands of Internet users, then files a lawsuit alleging that John DOEs associated with those IP addresses have infringed rights that the plaintiff allegedly holds.  The complaint misrepresents the grounds for joinder of the defendants, with the intent and result that plaintiff need only pay a single filing fee to initiate the case.

103.    The plaintiff then seeks – and is typically granted – early discovery to

subpoena information from various Internet Service Providers ("ISPs") to link the IP addresses with the names, addresses and sometimes telephone numbers of Internet subscribers.  The motion for early discovery promises that plaintiff will name, serve and proceed against defendants thus identified.

104.    Some ISPs notify their customers of the lawsuit and subpoenas.  This leads to a first wave of targets calling attorneys to inquire about filing "motions to squash" [sic].  In earlier years, many such motions were filed, but they are almost invariably denied.

105.    After the Internet customers' opportunity to file futile motions to quash passes, the ISPs produce records associating IP addresses with their customers who may have been assigned that address at a particular date and time.

106.    After receiving this customer information, the trolling plaintiff begins harassing the identified person.  First, a settlement demand letter is mailed.  Such letters are sometimes sent by FedEx or UPS, and are drafted to cause their lay recipients to believe that they have been named and served in a lawsuit, that their liability is a foregone conclusion, and that they must pay to settle the matter or risk a judgment of $150,000 or $300,000.

107.    When trolling first started, demands of $1,500 or $2,500 were common. In the present case, plaintiff has demanded $7,500 (increasing to $10,000 if payment is not made within about 10 days).

108.    Targeted Internet users who call the plaintiff's attorney are commonly assured that they are liable; and those who insist upon their innocence are told that they must submit to depositions, computer inspections, and that if they turn out to

have infringed the work at issue, they will be sued for vastly larger sums.

109.    Targeted Internet users who file motions to sever or dismiss at this point are frequently dismissed without prejudice, before those motions can be heard. Plaintiffs work diligently to avoid having any aspect of their scheme come to the attention of the court.

110.    When a deadline for service approaches, plaintiffs typically file a motion to extend time, citing the complexity of investigating a computer crime and the difficulty of obtaining such a large number of customer identifications from the ISPs, and promising to name and serve defendants soon.  Many courts grant such extensions as a matter of course.

111.    Eventually, the long pendency of a troll case on a court's docket (possibly augmented by hints of impropriety raised by harassed – but rarely named or served – putative defendants) leads the judge to issue a terminating OSC, in language that hints of sanctions.

112.    The troll case will invariably be dismissed without prejudice shortly before such an OSC hearing.  This dismissal is noted by attorneys representing targets, but is never communicated to unrepresented targets.  Plaintiffs' counsel continues to solicit and accept settlement payments from earlier-identified Internet users, for so long as such solicitation yields payments.

113.    In short, a copyright troll case abuses the subpoena power of the court to generate a mailing list of targets, who are shaken down for settlements.  Targets are seldom named or pursued in an action because plaintiffs' goal is not to prove or vindicate the infringement of their rights.  Instead, they merely seek to obtain payments

from individuals identified through the foregoing procedure.

114.    VOLTAGE PICTURES LLC has been engaged in copyright trolling since at least 2010.  Its case no. 1:10-cv-00873 in the District of Columbia was filed on 24-May-2010 against 5,000 DOEs (a number which eventually ballooned to 24,583, although there is reason to believe that far more IP addresses were presented to ISPs to bulk up the target mailing list even further).  After hundreds of extensions, letters to the Court, motions, dismissals, and other activity, the case terminated in plaintiff's stipulation of dismissal on 17 December 2011.  On the record, plaintiff obtained a few default judgments (typically against people whose letters to the court were deemed to be answers, or who became embroiled in the suit in some other nonstandard way).  Upon information and belief, no Doe was ever named, served and proved to have been liable for the infringement as charged.

115.    The case at bar is a copyright troll action.

116.    Plaintiff VOLTAGE PICTURES LLC has presented allegations that a number of individuals, identified only by IP address, infringed its copyrights.  Only one filing fee was paid, early discovery was sought, targets' names were obtained, and no target has been named or served.

117.    Plaintiff has sent settlement demand letters to a number of identified targets, including to defendant Mary HAVLICEK.

118.    The demand letter plaintiff sent to Mary HAVLICEK asserts that she is responsible for copyright infringement as DOE #322.  A true and correct copy of this letter is attached hereto as Exhibit B.

119.    As stated above, Mary HAVLICEK denies committing any of the actions

|    *Answer and Cross-Complaint of David and Mary HAVLICEK*

plaintiff alleges as constituting copyright infringement.

120.    Mary HAVLICEK is not the account holder of her family's Internet account.

121.    David HAVLICEK is the account holder of his family's Internet account.

122.    Upon information and belief, the HAVLICEK's ISP, CenturyLink, identified David HAVLICEK as DOE #322.

123.    As stated above, David HAVLICEK denies committing any of the actions plaintiff alleges as constituting copyright infringement.

## Affirmative Defenses

124.    Plaintiff VOLTAGE PICTURES LLC does not possess any exclusive right in respect of the motion picture *Maximum Conviction*.  Consequently, its suit is without merit as to any defendant.

125.    Plaintiff VOLTAGE PICTURES LLC and/or its authorized agents participated in BitTorrent swarms, and so any download committed by any defendant was from a source authorized to permit such download.  Consequently, any exercise by any defendant of an exclusive right protected by the Copyright Act was with the consent of an authorized party and not in derogation of any exclusive right.

126.    Any downloading or uploading of the copyrighted work was permitted by the doctrine of fair use.

127.    Any downloading or uploading of the copyrighted work was no more than a *de minimis* act.

128.    Any downloading or uploading of less than all of the copyrighted work results in a non-functional copy (*i.e.*, a partial copy that cannot under any

*Answer and Cross-Complaint of David and Mary HAVLICEK*

circumstances be used to infringe any of plaintiff's purported exclusive rights.) Therefore, no infringement of plaintiff's rights has occurred or can occur.

129.    Any partial copy of the copyrighted work is overwhelmingly likely to lack a proper copyright notice.  In the absence of such notice, plaintiff's asserted enhanced damages are not available.

130.    The infringement of plaintiff's purported rights that allegedly occurred through the concerted, common and conspiratorial action of individuals participating in a BitTorrent swarm constituted a single instance of infringement for which the participating individuals are jointly and severally liable, and for which plaintiff can only recover a single statutory damage award.  Upon information and belief, plaintiff has been made whole by one or more settling individuals.  Any further recovery would be in excess of statutory limits and of actual damages.

### Counterclaim 1: Declaratory Judgment of Non-Infringement

131.    The HAVLICEKs repeat and reallege each and every one of paragraphs 1 through 130.

132.    There is an actual controversy now existing between plaintiff and the HAVLICEKs.  Plaintiff has filed a suit alleging copyright infringement and has mailed a letter to Mary HAVLICEK, asserting that she is DOE #322 and demanding that she pay a settlement for the alleged infringement.

133.    The HAVLICEKs have an objectively reasonable apprehension of becoming the target of the lawsuit based on plaintiff's written threat to "add[] [Mary HAVLICEK] as a named defendant to the lawsuit or fil[e] a new and separate lawsuit against you for

copyright infringement."

134.    This Court has original and exclusive jurisdiction of copyright infringement matters pursuant to 28 U.S.C. § 1338.

135.    Mere dismissal from this lawsuit (with or without prejudice) is inadequate to vindicate Defendants' rights.  The HAVLICEKs are entitled to a declaration of non-infringement, as well as their costs and attorney fees as prevailing party in a copyright case, pursuant to 17 U.S.C. § 505.


### Counterclaim 2: Malicious Prosecution of a Civil Action

136.    The HAVLICEKs repeat and reallege each and every one of paragraphs 1 through 135.

137.    VOLTAGE PICTURES LLC has commenced a judicial proceeding against the HAVLICEKs (the action at bar).

138.    The HAVLICEKs expect a resolution of this proceeding in their favor, including a declaratory judgment of non-infringement in their favor.

139.    VOLTAGE PICTURES LLC did not possess the exclusive right it purported to have.  Therefore, it had no probable cause to initiate or prosecute this action.

140.    VOLTAGE PICTURES LLC's primary purpose in filing the action was to obtain discovery to build a mailing list of extortion targets.  Its secondary purpose was to avoid paying filing fees to the court.  It had neither intent nor ability to secure favorable adjudication of the claim of copyright infringement.

141.    The HAVLICEKs have been damaged by VOLTAGE PICTURES LLC's wrongful institution and prosecution of this civil action, in an amount to be proven at

trial.

### Counterclaim 3: Relief from Racketeer-Influenced and Corrupt Organization Activity

142.    Cross-defendants VOLTAGE PICTURES LLC and MAXCON PRODUCTIONS INC. are corporations and limited-liability companies whose businesses include the prosecution of copyright troll lawsuits, as described above, to extort settlement payments from Internet users, including from cross-plaintiffs Mary and David HAVLICEK.

143.    Cross-defendants ACME 1 – 25 ("ACME")[1] are, upon information and belief, limited-liability entities such as corporations and limited liability companies, formed and existing under the laws of a State, that are engaging in conduct substantially identical to or in support of that of the named cross-defendants, and in conspiracy with those cross-defendants. Cross-plaintiffs are presently unaware of the names and structures and citizenships of the ACME defendants, but will amend this Answer and Cross-complaint to state their names and identifying information when such is available.

144.    In the present case, at least one of VOLTAGE PICTURES LLC and MAXCON PRODUCTIONS INC. has intentionally misrepresented to the court that it owns the exclusive right, title and interest to the motion picture *Maximum Conviction*.

145.    At least one of VOLTAGE PICTURES LLC and MAXCON PRODUCTIONS INC.'s allegations in this suit and in 4:13-CV-00038 are objectively baseless in the sense

---

[1] Defendants whose names are unknown are traditionally identified as "DOE #*n*." However, in this case, the presently-unknown cross defendants are all believed to be corporations or similar entities, and in the conduct complained of, the cross defendants (including the ACME cross defendants) engaged in sham litigation against hundreds or thousands of unknown individual DOEs. To avoid confusion between the unknown cross defendants here and the "unknown" "defendants" in the sham cases, the HAVLICEKs will use the generic name "ACME" to refer to those corporate cross defendants.

*Answer and Cross-Complaint of David and Mary HAVLICEK*

that no reasonable litigant could realistically expect success on the merits of a copyright infringement claim where said litigant lacked any exclusive right, title or interest in the work at issue.

146.    All of VOLTAGE PICTURES LLC, MAXCON PRODUCTIONS INC. and ACME 1–25 have filed and continue to file copyright troll lawsuits pursuant to a policy of starting legal proceedings without regard to the merits, and for the unlawful purpose of extorting settlement payments from individuals identified through the early discovery process.

147.    Cross defendants file the sham lawsuits as described for two improper purposes: depriving the courts of filing fees that should be paid to pursue individual defendants; and obtaining court-sanctioned discovery solely to learn the names and addresses of extortion targets.

148.    Cross defendants never intend to pursue, and never do pursue, any identified extortion target to secure the legitimate outcome of a copyright infringement suit: a judgment that the target in fact committed the infringement alleged, and that he is liable therefor.

149.    Instead, Cross defendants, including specifically VOLTAGE PICTURES LLC, send settlement demand letters to Internet subscribers identified by ISPs in response to early-discovery subpoenas.

150.    No individualized investigation of any extortion target is undertaken between receiving the target's identity and transmitting the settlement demand letter. Thus, in addition to cross defendants' knowledge that they lack the rights alleged in their complaint, they have no reason to believe that the identified target is responsible

for the alleged infringement.

151.    The settlement demands are transmitted solely for the purpose of obtaining property from the recipient under fear of the sham lawsuit.

152.    The settlement demands contain intentional misrepresentations of material fact.  For example, VOLTAGE PICTURES LLC's demand to Mary HAVLICEK states that she "has already done [illegal file sharing]"; that VOLTAGE PICTURES LLC's counsel "intend[s] to name [her] as a defendant to the lawsuit and proceed against [her] on behalf of [VOLTAGE PICTURES]"; and that an enclosed waiver of service "needs to be returned within thirty (30) days."  None of these statements is true, and each is specifically intended (along with the balance of the letter) to induce fear of the objectively baseless lawsuit.

153.    At least some settlement demands were sent from VOLTAGE PICTURES LLC to one of the DOE defendants via U.S. mail, in violation of 18 U.S.C. 1341.

154.    The false statements were made to unrepresented individuals, and made with the intent and reasonable expectation that they would be believed as true statements of material fact.

155.    The false statements injure their recipients by causing fear, apprehension and emotional distress (indeed, that is their primary purpose).  They also injure some recipients because the recipients unnecessarily pay a settlement amount for release from an invalid, objectively baseless claim.  Not only is the release from a baseless claim worthless, but in many cases, the releasing party lacks the authority to grant a release from the infringement at all – the copyright is held by a third party who is not bound to honor the cross defendant's release.

*Answer and Cross-Complaint of David and Mary HAVLICEK*

**No Other Remedies Pursued**

156.    A media company that believes its copyrighted material is being unlawfully distributed has at its disposal a number of quasi-judicial remedies.  For example, the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512 provides a simple, expedited procedure by which an injured rights holder can apply to an Internet Service Provider to block or remove access to the offending material.  Then, once the immediate and ongoing injury has been addressed, the rights holder can proceed against infringers at its leisure.

157.    However, upon information and belief, no cross defendant ever issued a DMCA takedown notice to attempt to block the distribution of its material.

158.    Indeed, VOLTAGE PICTURES LLC's allegations establish that it or its agents *participated* in the computer network distribution activity, since this is how its investigator was able to acquire the IP addresses of the alleged infringers.

159.    Cross defendants' failure to pursue an available, rapid, inexpensive and effective remedy that would have stopped the infringing activity suggests that they and each of them had no actual desire to prevent the infringement of their works.

160.    Instead, upon information and belief, cross defendants make more money by permitting and/or encouraging infringement and extorting settlements from Internet subscribers whose connections may have been used in the alleged infringement, than by selling or licensing their material to bona fide purchasers.

I.    **Conspiracy Among Defendants**

161.    Cross defendants are superficially unrelated, and each merely engages independently in the identical course of action.  However, VOLTAGE PICTURES LLC and MAXCON PRODUCTIONS INC. have both filed suits alleging infringement of the

*Answer and Cross-Complaint of David and Mary HAVLICEK*

same copyrighted work.  Furthermore, upon information and belief, each cross defendant uses the same computer investigator to acquire its list of IP addresses.

162.    VOLTAGE PICTURES LLC and MAXCON PRODUCTIONS INC. coordinated and conspired to collect IP addresses of alleged infringers, and to separate those IP addresses using geolocation technology and divide them between themselves (and among other ACME defendants) so that each could pursue their campaign of extortion against a portion of the targets identified.

163.    Cross defendants' allegations and declarations in support of their motions for early discovery contain statements that are factually impossible, as well as statements that are technically inaccurate and do not support the conclusions for which they are presented in support of those motions.

164.    Cross defendants and their computer investigator and each of them know that the statements are false, and knowingly present them to the court to obtain early discovery.  Furthermore, cross defendants and each of them work diligently to prevent the falsity of the allegations and the expert statements from coming to the attention of the Judge to whom they are presented.

165.    Upon information and belief, cross defendants' computer investigator does not serve as a disinterested, independently-compensated expert for these cases. Instead, the investigator – through one of the ACME cross-defendants – participates and conspires in the scheme and receives a contingent share of the extrajudicially-extorted settlements received from Does who are targeted by this scheme.

166.    Cross defendants and each of them are aware of the actions of each of the others, and each coordinates its actions to ensure the continuation of this enterprise

and the overall effectiveness of the corrupt business model.

167.    Furthermore, a portion of the proceeds from these activities is reinvested in recruiting additional media companies and instituting new sham actions by existing cross defendants in new jurisdictions.

168.    The HAVLICEKs are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

169.    Each cross defendant is a "person" under 18 U.S.C. §§ 1961(3) and 1962(c) and (d).

170.    Cross defendants are a group of persons associated in fact for the common purposes of conducting the scheme described in this Answer, namely: Inducing the HAVLICEKs and similarly-situated individuals to settle a sham lawsuit by means of fraudulent claims for statutory damages and threats to take legal action when no basis for such action exists and none was intended to be taken.  As a result, cross defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) ("Enterprise").  During all relevant times, the Enterprise was engaged in and its activities affected interstate and foreign commerce.

171.    Cross defendants and each of them are employed by and/or associated with the Enterprise as detailed in this Answer.

172.    Cross defendants and each of them conducted and/or participated in the conduct of the Enterprise's affairs, as described in this Answer, through a pattern of racketeering activity, as that phrase is defined in 18 U.S.C. §§ 1961(1) and (5), by committing extortion, mail fraud and wire fraud in violation of 18 U.S.C. §§ 1951, 1341 and 1343.

                    *Answer and Cross-Complaint of David and Mary HAVLICEK*

173.    Specifically, cross defendants conspired in an intentional scheme to extort purported settlement payments from the HAVLICEKs and similarly-situated Internet subscribers through a pattern of false or fraudulent statements, representations, and malicious threats to disclose private facts including the person's sexual orientation.

174.    As a direct and proximate result of cross defendants' violation of 18 U.S.C. § 1962(c), the HAVLICEKs and similarly-situated Internet subscribers have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

175.    As a result of their misconduct, cross defendants are liable to the HAVLICEKs and similarly-situated Internet subscribers for their losses, in amounts to be determined at trial.  In addition, the HAVLICEKs and similarly-situated Internet subscribers are entitled to recover three times their damages, plus costs and attorney fees, from the cross defendants.

## Prayer for Relief

WHEREFORE, Defendants Mary and David HAVLICEK pray for relief as follows:

1.    A declaratory judgment that they did not infringe any exclusive right of plaintiff by any act or omission in connection with their residential Internet connection or otherwise;

2.    Damages that they suffered due to VOLTAGE PICTURES LLC's malicious prosecution of a baseless civil action, in an amount to be proven at trial;

3.    Threefold damages suffered by them and similarly-situated persons injured in their business or property by Plaintiff's conduct, in accordance with 18 U.S.C. § 1964(c); said damages to be restored to each person from whom Plaintiff and cross

defendants received such funds unless the person explicitly acknowledged liability for an alleged infringement of an actual, established exclusive right of Plaintiff;

4.     Injunctive relief restraining Plaintiff and cross defendants from continuing the corrupt sham litigation business described herein;

5.     Attorney fees pursuant to, *inter alia*, 17 U.S.C. § 505 and 18 U.S.C. § 1964(c), or otherwise as allowed by law;

6.     For Defendants' costs and disbursements; and

7.     For such other and further relief as the Court may deem just and proper.

| | |
|---|---|
| 15 April 2013 | |
| Date | David H. Madden, SBN OR080396<br>Attorney for Defendants Mary and David HAVLICEK<br>Mersenne Law LLC<br>1500 S.W. First Avenue<br>Suite 1170<br>Portland, Oregon 97201<br>dhm@mersenne.com<br>(503)679-1671 |

**Exhibit A**

**Complaint from U.S. District Court
for the Southern District of Georgia
Savannah Division
4:13-cv-00038**

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| Maxcon Productions Inc | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Case No. _____ | |
| | ) | |
| DOES 1 — 54 | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

COMPLAINT FOR COPYRIGHT INFRINGEMENT

Maxcon Productions Inc ("Plaintiff"), by and through its attorneys, files this Complaint against Does 1 – 54 (collectively, the "Defendants" or "John Doe Defendants") alleging copyright infringement and contributory copyright infringement, and seeking damages and injunctive relief. Maxcon Productions Inc alleges as follows:

JURISDICTION AND VENUE

1.      This is a suit for copyright infringement and contributory copyright infringement under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101 et seq. (the "Copyright Act"). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

2.      This Court has Federal subject matter jurisdiction over this matter pursuant to 17 US.C. § 101 et seq.; 28 US.C. § 1331 (federal question); and 28 US.C. § 1338(a) (copyright).

3.      Venue in this District is proper pursuant to 28 U.S.C. § 1391 (b) and 28 U.S.C. § 1391 (b) and 28 U,S.C. § 1400(a). The John Doe Defendants' true identities are unknown at this time, however Plaintiff has used geolocation technology to determine that, upon information and belief, each Defendant may be found in this State.

1

4.      In addition, this Court has personal jurisdiction over Defendants because geolocation technology places all Defendants within this State, and, upon information and within this District. All of the Defendants conspired to and did commit acts of copyright infringement and contributory copyright infringement statewide and nationwide, including in this State and in this District. Defendants, therefore, should anticipate being haled into court in this State and in this District.

<u>JOINDER</u>

5.      Defendants, whose true identities are unknown at this time, acted in a collective and interdependent manner via the Internet in the unlawful reproduction and distribution of Plaintiff's copyrighted motion picture, "Maximum Conviction," (the "Motion Picture") by means of interactive "peer-to-peer" ("P2P") file transfer technology protocol called BitTorrent.

6.      This case involves one "swarm" in which numerous Defendants engaged in mass copyright infringement of Plaintiff's Motion Picture. Each Defendant illegally uploaded and shared Plaintiff's Motion Picture within this swarm.

7.      Upon information and belief, each Defendant was a willing and knowing participant in the swarm at issue and engaged in such participation for the purpose of infringing Plaintiff's copyright.

8.      By participating in the swarm, each Defendant participated in the same transaction, occurrence, or series of transactions or occurrences as at least the other Defendants in the same swarm. In particular, Plaintiff's investigator has downloaded the Motion Picture from each Defendant identified herein. In addition, by participating in the swarm, each Defendant participated in a collective enterprise constituting "shared, overlapping facts."

2

9.    P2P networks, at least in their most common form, are computer systems that enable Internet users to: 1) make files (including motion pictures) stored on each user's computer available for copying by other users or peers; 2) search for files stored on other users' computers; and 3) transfer exact copies of files from one computer to another via the Internet. The particular P2P protocol at issue in this suit is called "BitTorrent."

10.    For example, user John Doe 4 of Savannah, Georgia initiated his or her infringing conduct by first intentionally logging into the one of many BitTorrent client repositories known for their large index of copyrighted movies, television shows, software and adult videos. John Doe 4 then intentionally obtained a torrent file for Plaintiffs Motion Picture from the index and intentionally loaded that torrent file into a computer program designed to read such files.  The torrent file obtained by John Doe 4 had "hash value" of 638080D0C71661D686B354B52663942BD69CD056 (the "Swarm Sharing Hash Value").  A hash value is file identifier generated by an algorithm developed and implemented by the National Security Agency. Hash values are used to identify and filter duplicate files and essentially act as a digital thumbprint for an electronic file.

11.    With the torrent file intentionally loaded by John Doe 4, his or her BitTorrent program used the BitTorrent protocol to initiate connections with hundreds of other users possessing and "sharing" copies of the digital media described in Swarm Sharing Hash Value, namely, Plaintiff's Motion Picture, including with, upon information and belief, other identified John Doe Defendants. The program coordinated the copying of Plaintiff's Motion Picture to John Doe 4's computer from the other users, or peers, sharing the film. As the Motion Picture was copied to John Doe 4's computer piece by piece, these downloaded pieces of Plaintiff's Motion Picture were then immediately available to all other Defendants for those Defendants' uses from John Doe 4's computer.

3

12.    Each of the John Does 1-54 performed the same acts as those described for John Doe 4, in paragraphs 10 and 11. Each of these Defendants also immediately became an uploader, meaning that each Defendant's downloaded pieces were immediately available to other users seeking to obtain the file, without degradation in sound or picture quality. It is in this way that each Defendant copied and distributed the Motion Picture at the same time. Thus, each participant in the BitTorrent swarm was an uploader (distributor) and a downloader (copier) of the illegally transferred file. Here, upon information and belief members of the swarm at issue downloaded and uploaded portions of Plaintiff's Motion Picture to each other and did so using the same Swarm Sharing Hash Value.

13.    This interactive data-sharing connection is often referred to as a "swarm" and leads to a rapid viral spreading of a file throughout peer users. As more peers join the swarm, the likelihood of a successful download increases. Because of the nature of a BitTorrent protocol, any user that has downloaded a piece prior to the time a subsequent user downloads the same file is automatically a source for the subsequent peer so long as that prior user is online at the time the subsequent user downloads a file. Thus, after a successful download of a piece, the piece is made available to all other users.

14.    Therefore, a Defendant's distribution of even a single unlawful copy of the Motion Picture can result in the nearly instantaneous worldwide distribution of that single copy to an unlimited number of people. In this case, each Defendant's copyright infringement built upon the prior infringements, in a cascade of infringement.

15.    Essentially, because of the nature of the swarm uploads and downloads as described above, every John Doe Defendant, in concert with its fellow swarm members, is allowing others to steal (download from the swarm) Plaintiff's copyrighted materials in numerous jurisdictions around the country, including this jurisdiction. This illegal data-

4

sharing swarm is performed because each John Doe acts in an interactive manner with other John Does, including with, upon information and belief, other identified John Doe Defendants, allowing other users to illegally download the unlawfully obtain copyrighted materials at issue in this action. Thus, there is a significant amount of infringement in this District, and a significant transmission of infringing materials to and from this District.

16.    In addition, because a BitTorrent swarm is a collective enterprise where each downloader is also an uploader, the group of uploaders collaborates to speed the completion of each download of the file.

17.    Upon information and belief, many John Doe Defendants also acted in concert with other John Doe swarm members and Defendants by participating in "Peer Exchange." Peer Exchange is a communications protocol built into almost every BitTorrent protocol which allows swarm members to share files more quickly and efficiently. Peer Exchange is responsible for helping swarm members find more users that share the same data. Thus, each swarm member is helping all other swarm members participate in illegal file sharing, regardless of geographical boundaries.

18.    Upon information and belief, many John Doe Defendants also acted in concert with other John Doe swarm members and Defendants by linking together globally through use of a Distributed Hash Table. A Distributed Hash Table is a sort of world-wide telephone book, which uses each file's "hash value" to locate sources for the requested data. Thus, swarm members are able to access a partial list of swarm members rather than being filtered through a central computer called a tracker. By allowing members of the swarm to rely on individual computers for information, this not only reduces the load on the central tracker, but also means that every client that is sharing this data is also helping to hold this worldwide network together.

19.    The torrent swarm in this case is not an actual entity, but is rather made up of numerous individuals, acting in concert with each other, to achieve the common goal of infringing upon the Plaintiff's copyright.

PARTIES

20.    Maxcon Productions Inc, is a California corporation that develops, produces, markets and distributes motion pictures.  Its principal place of business is 100 Universal City Plaza 5183, Universal City, CA, 91608.

21.    Defendants are a group of BitTorrent users or peers whose computers are collectively interconnected within a swarm for the sharing of unique files.  All of the Defendants are part of a BitTorrent swarm is associated with has a unique Swarm Sharing Hash Value.

22.    The Swarm Sharing Hash Value file provides access to an unauthorized copy of Plaintiff's copyrighted Motion Picture.

23.    Defendants' infringements allow them and others to unlawfully obtain and distribute unauthorized copies of Plaintiff's Motion Picture for which Plaintiff spent a substantial amount of time, money and effort to produce, market and distribute. The Motion Picture is currently offered for sale on the internet and in various retail locations in the US and worldwide.

24.    Each time a Defendant unlawfully distributes a free copy of Plaintiff's copyrighted Motion Picture to others over the Internet, particularly via BitTorrent, each recipient can then distribute that unlawful copy to others without degradation in sound or picture quality. Thus, a Defendant's distribution of even one unlawful copy of a motion picture can result in the nearly instantaneous worldwide distribution to a limitless number of people. Plaintiff now seeks redress for this rampant infringement of its exclusive rights in its Motion Picture.

25.    Despite Plaintiff's use of the best available investigative techniques, it is impossible for Plaintiff to identify Defendants by name at this time. Thus, the true names and capacities, whether individual, corporate, associate or otherwise, of John Doe Defendants 1-54 are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names.

26.    Each Defendant is known to Plaintiff by the Internet Protocol ("IP") address assigned to that Defendant by his or her Internet Service Provider ("ISP") on the date and at the time at which the infringing activity of each Defendant was observed. This information is provided in the attached Exhibit A. In addition, and as provided in Exhibit A, Plaintiff has learned the ISP for each Defendant, the file copied with the same Swarm Sharing Hash Value and distributed by each Defendant, and the location of the Defendants (by city and state) at the time of download as determined by geolocation technology on upon information and belief.

27.    Plaintiff believes that information obtained in discovery will lead to the identification of each John Doe Defendant's true name and permit the Plaintiff to amend this Complaint to state the same. Specifically, Plaintiff intends to subpoena the ISPs that issued the John Doe Defendants' IP addresses in order to learn the identity of the account holders for the IP addresses.

28.    Plaintiff further believes that the information obtained in discovery may lead to the identification of additional infringing parties to be added to this Complaint as Defendants, since monitoring of online infringement of Plaintiff's Motion Picture is ongoing.

STATEMENT OF FACTS
THE COPYRIGHT

29.    Plaintiff is, and at all relevant times has been, the copyright owner of exclusive rights under United States copyright law with respect to the Motion Picture.

30.     The Motion Picture contains wholly original material that is copyrightable subject matter under the laws of the United States.

31.     Plaintiff, as the owner, holds the copyright registration on the Motion Picture, including Copyright Registration Number PAu 3-647-070 (the "Copyright"). See Exhibit B, Certificate of Registration.

32.     Under the Copyright Act, Plaintiff is the proprietor of all right, title, and interest in the Copyright, including the right to sue for past infringement.

33.     Under the Copyright Act, Plaintiff also possesses the exclusive rights to reproduce the copyrighted work and to distribute the copyrighted work to the public.

34.     Defendants had notice of Plaintiff's copyright rights. At least Plaintiff's Motion Picture DVD case displays a copyright notice.

COPYRIGHT INFRINGEMENT AND BITTORRENT

35.     BitTorrent is a peer-to-peer file sharing protocol used for copying and distributing data on the Internet, including files containing digital versions of motion pictures. Rather than downloading a file from a single source, the BitTorrent protocol allows users to join a swarm, or group of users to download and upload from each other. The process works as follows:

36.     Users intentionally download a small program that they install on their computers — the BitTorrent "client" application. The BitTorrent client is the user's interface during the downloading/uploading process. There are many different BitTorrent clients, all of which are readily available on the Internet for free.

37.     BitTorrent client applications typically lack the ability to search for torrent files. To find torrent files available for download (as made available by other BitTorrent users), users intentionally visit torrent sites using any standard web browser.

38.     A torrent site is a website that contains an index of torrent files being made available by other users (generally an extensive listing of movies and television programs, among other copyrighted content). The torrent site hosts and distributes small torrent files known as "torrent files." Although torrent files do not contain actual audio/visual media, they instruct a user's computer where to go and how to get the desired file. Torrent files interact with specific trackers, allowing the user to download the desired file.

39.     The torrent file contains a unique hash value which is a unique identifier generated by a mathematical algorithm developed by the National Security Agency. This torrent file is tagged with the file's unique "info-hash," which acts as a roadmap to the IP addresses of other users who are sharing the media file identified by the unique info-hash, as well as specifics about the media file.

40.     A BitTorrent tracker manages the distribution of files, connecting uploaders (those who are distributing content) with downloaders (those who are copying the content). A tracker directs a BitTorrent user's computer to other users who have a particular file, and then facilitates the download process from those users. When a BitTorrent user seeks to download a movie or television file, he or she merely clicks on the appropriate torrent file on a torrent site, and the torrent file instructs the client software how to connect to a tracker that will identify where the file is available and begin downloading it. In addition to a tracker, a user can manage file distribution through a Peer Exchange and/or a Distributed Hash Table.

41.     Files downloaded in this method are downloaded in hundreds of individual pieces. Each piece that is downloaded is immediately thereafter made available for distribution to other users seeking the same file. The effect of this technology makes every downloader also an uploader of the content. This means that every user who has a copy of the infringing material on a torrent network must necessarily also be a source of download for that material.

9

42.     Thus, each IP address identified by the tracker is an uploading user who is currently running a BitTorrent client on his or her computer and who is currently offering the desired motion picture file for download. The downloading user's BitTorrent software then begins downloading the motion picture file without any further effort from the user, by communicating with the BitTorrent client programs running on the uploading users' computers.

43.     The life cycle of a file shared using BitTorrent begins with just one individual — the initial propagator, sometimes called a "seeder." The initial propagator intentionally elects to share a torrent file with a torrent swarm. The original file, in this is Swarm Sharing Hash Value, which provides access to Plaintiff's copyrighted Motion Picture.

44.     Other members of the swarm connect to the respective seeds to download the files, wherein the download creates an exact digital copy of Plaintiff's copyrighted Motion Picture on the downloaders' computers. For the swarm, as additional infringers request the same file, each additional infringer joins the collective swarm, and each new infringer receives pieces of the file from each other infringer in the swarm who has already downloaded any part of the file. Eventually, once the initial propagator has distributed each piece of the file to at least one other infringer, so that together the pieces downloaded by members of the swarm comprise the whole Motion Picture when reassembled, the initial propagator may leave the swarm, and the remaining infringers can still obtain a full copy of the Motion Picture by exchanging the pieces of the Motion Picture that each one has.

45.     Files downloaded in this method are received in hundreds or even thousands of individual pieces. Each piece may be contributed from a different member of the swarm. Moreover, each piece that is downloaded is immediately thereafter made available for distribution to other users seeking the same complete file. Thus, the effect of this technology

effectively makes every downloader of the content also an uploader. This means that every user who has a copy of the infringing material in a swarm may also be a source for later downloaders of that material.

46.    This distributed nature of BitTorrent leads to a rapid viral sharing of a file throughout the collective peer users. As more peers join the collective swarm, the frequency of successful downloads also increases. Because of the nature of the BitTorrent protocol, any user that has downloaded a file prior to the time that a subsequent peer downloads the same file is automatically a source for the subsequent peer, so long as that first peer is online at the time the subsequent peer requests the file from the swarm. Because of the nature of the collective swarm, every infringer is — and by necessity all infringers together are — both stealing the Plaintiff's copyrighted material and redistributing it.

47.    Plaintiff has recorded each Defendant identified herein actually publishing the Motion Picture via BitTorrent, as Plaintiff's investigator has downloaded the Motion Picture from each Defendant identified herein.

48.    Plaintiff's Motion Picture is easily discernible as a professional work. Plaintiff created the Motion Picture using professional performers, directors, cinematographers, lighting technicians, set designers and editors. Plaintiff created the Motion Picture with professional-grade cameras, lighting, and editing equipment.

49.    At least Plaintiff's Motion Picture DVD case displays a copyright notice.

50.    At various times, Plaintiff discovered and documented its copyrighted Motion Picture being publicly distributed by John Doe Defendants 1-54 by and through the BitTorrent network.

51.    Defendants, without authorization, copied and distributed the audiovisual Motion

Picture owned by and registered to Plaintiff in violation of 17 U.S.C. §§ 106(1) and (3).

## DEFENDANTS ARE MEMBERS OF A SINGLE BITTORRENT SWARM

52.     Defendants are peer members who have each participated in one P2P network swarm that was utilized to unlawfully infringe upon Plaintiff's exclusive rights in its copyrighted Motion Picture without permission.

53.     Each Defendant initiated his or her infringement by searching for and obtaining a torrent file containing information sufficient to locate and download Plaintiff's copyrighted Motion Picture. Thereafter, each Defendant opened the torrent file using a BitTorrent client application that was specifically developed to read such file.

54.     Each Defendant is a member of a single swarm. Exhibit A.

55.     Each John Doe Defendant owns or otherwise has control of a different computer collectively connected to the Internet via an IP address that contained — or possibly still contains — a torrent file identifying Plaintiff's copyrighted Motion Picture. Each computer also contained or still contains Plaintiff's copyrighted Motion Picture, which was downloaded using the information encoded in the torrent file.

56.     All of the Defendants republished and duplicated the Plaintiff's Motion Picture in an effort to deprive the Plaintiff of its exclusive rights in the Motion Picture under the Copyright Act.

## COUNT I
## DIRECT COPYRIGHT INFRINGEMENT

57.     Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1through 56 as if fully set forth herein.

12

58.     Plaintiff is, and at all relevant times, has been, the copyright owner of the Motion Picture infringed upon by all Defendants.

59.     Among the exclusive rights granted to Plaintiff under the Copyright Act are the exclusive rights to reproduce the Motion Picture and to distribute the Motion Picture to the public.

60.     The Plaintiff alleges that each Defendant, without the permission or consent of the Plaintiff, has used, and continues to use, BitTorrent software to download the Motion Picture, to distribute the Motion Picture to the public, including hundreds of other BitTorrent users, and/or to make the Motion Picture available for distribution to others. In doing so, Defendants have violated Plaintiff's exclusive rights of reproduction and distribution. Defendants' actions constitute infringement of Plaintiff's copyright and exclusive rights under copyright. Exhibit A identifies the John Doe Defendants known to Plaintiff as of the date of this Complaint who have, without the permission or consent of Plaintiff, distributed the copyrighted Motion Picture *en masse,* through a public website and any one of various public BitTorrent trackers, Peer Exchanges, and/or Distributed Hash Tables.

61.     Each Defendant's acts of infringement have been willful, intentional, and in disregard of and with indifference to the rights of Plaintiff.

62.     As a result of each Defendant's infringement of Plaintiff's exclusive rights under copyright, Plaintiff is entitled to either actual or statutory damages pursuant to 17 U.S.C. § 504 and to its attorney's fees and costs pursuant to 17 U.S.C. § 505.

63.     The conduct of each Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury. Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting each Defendant from further infringing Plaintiff's copyright and ordering that each Defendant destroy all copies of the

13

copyrighted Motion Picture made in violation of Plaintiff's exclusive rights to the copyright.

## COUNT II
## CONTRIBUTORY COPYRIGHT INFRINGEMENT

64.     Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1 through 63 as if fully set forth herein.

65.     Plaintiff is, and at all relevant times, has been, the copyright owner of the Motion Picture infringed upon by all Defendants.

66.     Among the exclusive rights granted to Plaintiff under the Copyright Act are the exclusive rights to reproduce the Motion Picture and to distribute the Motion Picture to the public.

67.     The Plaintiff alleges that each Defendant, without the permission or consent of the Plaintiff, has participated in a BitTorrent swarm directed at making the Motion Picture available for distribution to himself or herself as well as others, has used, and continues to use, BitTorrent software to download the Motion Picture, to distribute the Motion Picture to the public, including hundreds of other BitTorrent users, and/or to make the Motion Picture available for distribution to others. In doing so, Defendants have violated Plaintiff's exclusive rights of reproduction and distribution.

68.     By participating in the BitTorrent swarm with other Defendants, each Defendant induced, caused or materially contributed to the infringement of Plaintiff's copyright and exclusive rights under copyright by other Defendants and other swarm members. Exhibit A identifies the John Doe Defendants known to Plaintiff as of the date of this Complaint who have, without the permission or consent of Plaintiff, contributed to the infringement of Plaintiff's copyright by other Defendants and other swarm members.

69.     Each Defendant's acts of contributory infringement have been willful, intentional, and in disregard of and with indifference to the rights of Plaintiff.

70.     As a result of each Defendant's contributory infringement of Plaintiff's exclusive

rights under copyright, Plaintiff is entitled to either actual or statutory damages pursuant to 17 U.S.C. § 504 and to its attorney's fees and costs pursuant to 17 U.S.C. § 505.

71.   The conduct of each Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury. Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting each Defendant from further contributing to the infringement of Plaintiff's copyright and ordering that each Defendant destroy all copies of the copyrighted motion picture made in violation of Plaintiff's exclusive rights to the copyright.

WHEREFORE, Plaintiff prays for judgment against each Defendant as follows:

A.  For entry of preliminary and permanent injunctions providing that each Defendant shall be enjoined from directly or indirectly infringing Plaintiff's rights in the copyrighted Motion Picture, including without limitation by using the Internet to reproduce or copy Plaintiff's Motion Picture, to distribute Plaintiff's Motion Picture, or to make Plaintiff's Motion Picture available for distribution to the public, except pursuant to a lawful license or with the express authority of Plaintiff. Defendants also shall destroy all copies of Plaintiff's Motion Picture that Defendants have downloaded onto any computer hard drive or server without Plaintiff's authorization and shall destroy all copies of those downloaded Motion Picture transferred onto any physical medium or device in each Defendant's possession, custody, or control.

B.  For actual damages or statutory damages pursuant to 17 U.S.C. § 504, at the election of the Plaintiff.

C.  For Plaintiff's costs.

15

D.  For Plaintiff's reasonable attorney's fees.

E.  For such other and further relief as the Court deems proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.


DATED:  February 14, 2013


Respectfully submitted,


By:   s/Nathan C. Belzer/_____
Nathan C. Belzer
Ga. Bar. No. 049786
Belzer PC
2905 Bull Street
Savannah, GA 31405
phone: 912.236.3001
fax: 912.236.3003
email: nbelzer@belzerlaw.com

Attorney for Plaintiff
Maxcon Productions Inc

**Exhibit B**


**Settlement Demand Letter from Plaintiff to Mary HAVLICEK**

CROWELL LAW
943 Liberty Street SE - P.O. Box 923
Salem, Oregon 97308-0923
Tel: 503-581-1240
http://www.kite.com

Saturday, March 23, 2013

Mary Havlicek
2210 SE Courtney Road
Milwaukie, OR 97222

VIA Priority Mail

*** Settlement Offer ***

| | | |
|---|---|---|
| RE: | Copyright infringement of: | *Maximum Conviction (Film)* |
| | Civil Action No.: | *3:13-cv-00295-AA  Federal Court District of Oregon* |
| | Plaintiff: | *Voltage Pictures* |
| | IP Address / Doe: | *75.164.209.1 / #322* |
| | Infringement Date &Time: | *12/7/12 11:39:25 PM UTC* |

Response Deadline:   <u>4/10/13</u>

Dear Ms. Havlicek;

Thank you for your telephone call today.  Our law firm has filed a federal copyright infringement lawsuit in the U.S. District Court for the District of Oregon on behalf of our client, Voltage Pictures, LLC.  Please see the enclosed complaint.  You have been identified as the party responsible for the Internet Protocol ("IP") address used to illegally copy or share our client's copyrighted motion picture through a peer-to-peer network ("P2P") e.g., BitTorrent.  This letter is a courtesy before we are required to take more formal legal action which would involve adding you as a named defendant to the lawsuit or filing a new and separate lawsuit against you for copyright infringement.  We have also included with this letter a FAQ addressing several common questions, a settlement offer, the scheduling order for the case and a waiver of service. Please review these documents carefully

According to our records, you have placed a media file which contains the copyright-protected film content for our client's motion picture entitled "Maximum Conviction" in a shared folder location enabling others to download copies of this content.  In addition, we have evidence that the P2P client software you used to obtain or share the film was µTorrent 3.2.2  and that your file hash factor (a mathematical function through which a file can be identified with certainty) was SHA1: 6D9939B15CAFC400E97C320853B2236B26186EFA.  We also have obtained the file name of the movie, the file size and additional metadata, all corresponding to an IP address that was assigned to you at the time the infringing activity occurred.

Copyright infringement (in this case obtaining and distributing a film without paying for it and/or sharing a film with others who have not paid for it) is a very serious problem for the entertainment industry. Our client takes the enforcement of its copyright seriously and will use all legal means available to it to protect its rights.

3/23/13

The law provides protection for copyright owners through the Federal copyright statute found at 17 U.S.C. §§ 501-506, which allows the copyright owner to impound your material, such as material on your computer(s), recover their attorney's fees, and seek damages of up to $150,000 per work, depending on the circumstances surrounding the infringement. While it is too late to undo the illegal file sharing you have already done, we have prepared an offer to enable our client to recoup the damages incurred by your actions and defray the costs of preventing this type of activity in the future. Our client's offer to settle considers multiple factors, including the significant costs needed to enforce its copyright from infringing conduct such as yours, damages, and its need to deter future actions from you and others.

In exchange for a comprehensive release of all legal claims which will enable you to avoid becoming a named defendant in the lawsuit, our firm is authorized to accept the sum of Seven Thousand Five Hundred Dollars ($7,500.00) as full settlement for its claims. This offer will expire in two weeks. Thereafter, if our client chooses to settle, the demand shall be Ten Thousand Dollars ($10,000.00) and this amount will continue to increase as litigation expenses accrue.

You may pay the settlement amount by a check or money order made out to "Crowell Law" and mailed to our address shown at the top of this letter. Please include the signed Release & Settlement Agreement enclosed with your payment, and be sure to write "*3: 13-cv-00295-AA* Doe # 322" on the memo line. Once we have received payment and the signed Release & Settlement Agreement, we will return to you a confirmation that your payment has been received and you have been released from the lawsuit.

We look forward to resolving this without further action on our part, however if you do not comply with the above requests we intend to name you as a defendant to the lawsuit and proceed against you on behalf of our client either individually in a severed suit if you request, or jointly in the filed pending suit. We leave the election of how you wish to proceed up to you, though we note costs and fees to sever and proceed against you individually in a separate suit are notable and we will demand that all such costs and fees be added to any settlement.

If forced to proceed against you, our client reserves the right to recover the maximum amount of damages, costs and attorney fees provided under the Copyright Act, which is $30,000 and up to $150,000 if the act was intentional, plus attorney fees and costs of litigation. This is per illegally downloaded film. In light of the known facts of this case we have no doubt this infringement was intentional.

Further, while you have the right to have us prove all relevant facts in a court of law, we reserve the right to assess against you all costs and fees to fully present this matter to a judge or jury. It is not our intent to have this matter cost any more than necessary and certainly not our intent to add what we believe would be unnecessary attorney fees. Should you wish to contest this case, we have enclosed a waiver of service, with a copy, and self addressed stamped envelope for return. This waiver needs to be returned within thirty (30) days. *Even if you believe the claims against you are groundless, pursuant to FRCP 4(d) costs and fees may still be assessed for your failure to promptly return the enclosed waiver.*

---

CROWELL LAW
943 Liberty Street SE - P.O. Box 923
Salem, Oregon 97308-0923

Consider this letter to constitute formal notice that until and unless we are able to settle our client's claim with you, we demand that *you not delete any files from your computer(s)*. If forced to proceed against you in the lawsuit, we will have a computer forensic expert inspect your computer(s) to verify the subject movie file, or to determine if you have deleted any media files since receipt of the notice of the subpoena from your ISP. We will assess these costs against you in any future settlement offer. If in the course of litigation the forensic computer evidence suggests that you did delete relevant files following receipt of notice of this suit, our client will amend its complaint to add a spoliation of evidence claim against you. Be advised that if we were to prevail on this additional claim, the court could award additional monetary sanctions, evidentiary sanctions and attorney fees. If you are unfamiliar with the nature of this claim in this context, please consult an attorney.

We strongly encourage you to consult with an attorney to review your rights and risk exposure in connection with this matter. If you have further questions, you may contact me at 503-581-1240 or maxcon@kite.com. We thank you in advance for your anticipated cooperation in this matter, and we look forward to resolving our client's claim against you in an amicable fashion - through settlement.

Sincerely,

Carl D. Crowell

encls:    FAQ
          Settlement and Release (2x)
          Complaint *3:13-cv-00334-AC*
          Scheduling Order
          Waiver of Service (2x)
          SASE

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT

for the

District of Oregon

| | |
|---|---|
| VOLTAGE PICTURES, LLC | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  3:13-CV-00295-AA |
| DOES 1 - 371 | ) |
| *Defendant* | ) |

## WAIVER OF THE SERVICE OF SUMMONS

To:  Carl D. Crowell,  MAXCON@KITE.COM
        *(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____03/23/2013_____, the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
*Signature of the attorney or unrepresented party*

DOE #322- MARY HAVLICEK
*Printed name of party waiving service of summons*

_____
*Printed name*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

## SETTLEMENT & RELEASE AGREEMENT

RE:    Copyright infringement of:      Maximum Conviction (Film)
       Civil Action No.:               3:13-cv-00295-AA  Federal Court District of Oregon
       Plaintiff:                      Voltage Pictures
       IP Address / Doe:               75.164.209.1/#322
       Infringement Date &Time:        12/7/12 11:39:25 PM UTC

THIS SETTLEMENT & RELEASE AGREEMENT (the "Agreement") is entered into as of the last date as signed by the parties below ("Effective Date"), by and between Voltage Pictures, LLC (the "Owner"), and Mary Havlicek, (the "Subscriber"), whose address is 2210 SE Courtney Road Milwaukie, OR 97222, who is known as "Doe #322" in the Lawsuit, and who used the IP Address 75.164.209.1 ("IP Address"), (Owner and Subscriber are collectively the "Parties").

RECITALS

   A.  Whereas, the Subscriber's Internet Service Provider identified the Subscriber as being the owner of the IP address that Owners' investigators identified as having been used to upload and/or download a copy of Owner's copyrighted movie, "Maximum Conviction" (the "Work") on or about 12/7/12 11:39:25 PM UTC.

   B.  The Owner filed an action against Defendants in the United States District Court for the District of Oregon, pending as Case No. 3:13-cv-00295-AA, before Chief Judge Ann Aiken (the "Lawsuit").

   C.  Whereas in order to avoid the cost, disruption, and inconvenience of further dispute, the Parties desire to achieve an amicable settlement of the Lawsuit as set forth below.

NOW, THEREFORE, in consideration of the foregoing recitals, for the good and valuable consideration of the promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties enter into the following agreement:

1.  Settlement Money. In exchange for the consideration set forth herein, Subscriber shall pay to Owners the sum of Seven Thousand Five Hundred Dollars ($7,500.00) (the "Settlement Money"). The Settlement Money shall be in the form of a certified check, money order, or valid check made payable to the Crowell Law, and must be paid within seven (7) days of the Effective Date of this agreement (the "Settlement Payment Due Date"). Time is of the essence.

2.  Confidentiality – Non Admission. The Subscriber agrees that Subscriber will keep the terms of this Settlement Agreement confidential. Subscriber agrees and warrants that Subscriber will not discuss the terms of this Settlement Agreement with any person or entity not a party to this Settlement Agreement, exclusive of their counsel, unless so ordered by a court of competent jurisdiction. Notwithstanding the foregoing, the Subscriber may disclose the terms of the Settlement Agreement, only to the extent necessary and reasonable, to their attorneys, financial planners or consultants, accountants and bookkeepers, banks or insurers, so long as those third parties agree to maintain such terms in confidence. Further notwithstanding the foregoing, in the event of any legal action or proceeding or asserted requirement under applicable law or government regulations requesting or demanding disclosure of this

*Against Free Speech*

Agreement or the terms hereof, the Subscriber shall forthwith notify the Owner in writing of such request so that the Owner may seek an appropriate protective order or take other protective measures. Subscriber shall fully assist and cooperate in Owner's attempt to secure a protective order or other protective measures.

*Against Free Speech*

3. **Non-Disparagement.** Subscriber agrees that Subscriber will not make or cause to be made any disparaging remarks about Owner, or any of the employees, agents, representatives, attorneys or affiliates of Owner (the "Owner Affiliates"), that could reasonably result in harm to the Owner's or the Owner Affiliate's reputation, image, business relationships or goodwill.

4. **Compromise.** This Agreement is the result of a compromise and shall not be construed as an admission by the Parties of any liability, wrongdoing, or responsibility on their part or on the part of their predecessors, successors, parents, subsidiaries, affiliates, attorneys, officers, directors or employees. Indeed, the parties expressly deny any such liability, wrongdoing or responsibility.

5. **Releases.**
   (a) Fully conditioned and contingent upon the Subscriber paying the Settlement Money in full by the Settlement Payment Due Date and fulfilling all of Subscriber's obligations herein and further upon all of Subscriber's representations and warranties hereunder being true, Owner, Voltage Pictures, LLC, shall release acquit, satisfy and forever discharge the Subscriber of all charges, claims, actions, rights, demands, debts, obligations, damages or accountings of whatever nature, in law or in equity, based upon any actual, potential or attempted copyright infringement of the Work on as outlined in the Lawsuit, and any ongoing infringement of the Work occurring prior to the Effective Date.
   (b) After receipt of the timely Settlement Payment Owner shall file with the United States District Court for the District of Oregon a notice of dismissal dismissing all claims in the Lawsuit against Subscriber with prejudice. The notice of dismissal shall affirmatively state that the Parties shall pay their own attorneys' fees, costs and expenses associated with the Lawsuit. In the event that Subscriber is not yet named it the Lawsuit by name, Owner will dismiss the Subscriber by reference to Doe Number and IP Address. Notwithstanding the foregoing, Owner my delay filing the dismissal for Subscriber until all cases have settled or at such time as it would be convenient for Owner to dismiss multiple Defendants at one time.
   (c) The Subscriber hereby releases, acquits, satisfies and forever discharges Owner and its officers, agents, shareholders, subsidiaries, affiliates, successors, predecessors, agents, representatives, administrators, fiduciaries, parents, directors, employees, members, insurers, assigns, attorneys, and other representatives and anyone else acting on Owner's behalf or related to this matter of and from all, and all manner of all charges, claims, actions, rights, demands, debts, obligations, damages or accountings of whatever nature, in law or in equity, based upon any events, claims, actions or inactions that occurred prior to the Effective Date and of and from any actions, suits, debts and sums of money, claims and demands whatsoever, in law or equity, known or unknown, which they ever had, now have or may have or claim to have for and/or by reason of any matter, cause or thing relating in any way to or arising in any way from the Lawsuit or which was or could have been the subject of the Lawsuit.

6. **Warranties & Representations.** Subscriber warrants and represents that Subscriber, other than with respect to the infringement of the Work as alleged in the Lawsuit, has not and will not

copy, distribute, display or otherwise infringe upon the Work or any copyrighted material owned by Owner, or for which Owner maintains or owns any rights.

7. Independent Counsel. Each party acknowledges that it has received independent legal advice from its counsel, or has had the opportunity to seek advice from counsel, with respect to the facts and this Agreement.

8. Legal Fees and Costs; Enforcement. Each party shall be responsible for paying its respective legal expenses and costs incurred in connection herewith, and no moneys will be exchanged except as otherwise provided for herein. Notwithstanding the foregoing, should it become necessary for Owners to institute a legal action to enforce any terms of this Agreement (including claims for breach of any obligation, warranty, or representation and further including to collect any portion of the Settlement Money or to recover upon a worthless check), Owners shall be entitled to recover from Subscriber Owner's reasonable attorneys' fees, litigation expenses, and all costs associated with any such enforcement or collection effort. Nothing herein shall limit Owner's rights or causes of action upon the infringement of Subscriber. In the event of any breach by Subscriber of any obligation, warranty or representation herein, Owner shall have the right to enforce the terms of and shall have the right to file claims seeking equitable remedies and damages under any and all available legal theories, including copyright infringement. Subscriber agrees, warrants and represents that Owner has valid title and rights in the Work and Subscriber waives the right to bring or assert any and all claims or defenses related to invalid copyright, registration or ownership, or claims or defenses related to copyrightability or infringement.

9. Nonwaiver. No provision of this Agreement shall be adjudged waived unless any such waiver is signed by the party against whom the waiver is asserted. The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

10. Severability. If any provision or application of this Agreement shall be held invalid or unenforceable then any such provision shall be deemed severed from this Agreement and the remaining provisions and applications of this Agreement shall not be affected, but rather shall remain valid and enforceable.

11. Entire Agreement. This Agreement constitutes the entire agreement and supersedes any and all other understandings and agreements between the parties with respect to the subject matter hereof and no representation, statement or promise not contained herein shall be binding on either party. This Agreement may be modified only by a written amendment duly signed by each party. The Parties mutually acknowledge and affirm that they are not relying upon any representations or promises of any kind not expressly set forth in this Settlement Agreement.

12. Execution in Counterparts. This Agreement may be executed in two or more counterparts each of which shall be deemed an original and each of which when combined with the other shall constitute one and the same instrument. Photocopy, facsimile, electronic, or other copies of signatures shall have the same effect as an ink-signed original.

13. Successors and Assigns. This Agreement shall be binding on and inure to the benefit of all parent companies, affiliates, subsidiaries, related companies, defendants, franchisees, successors and assigns of each of the parties hereto.

14. Jointly Drafted.  The Parties to this Agreement have cooperated, or shall be deemed to have cooperated, in the drafting and preparation of this Agreement.  This Agreement shall not be construed against either party on the basis that the party was the drafter or on the ground that such agreement is an agreement of adhesion.

15. Jurisdiction and Venue:  This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of Oregon, and any disputes related to this Settlement Agreement or relating to the Lawsuit shall be brought in the United States District Court for the District of Oregon, which will retain jurisdiction over this case for purposes of any such disputes, and the parties consent to jurisdiction therein.

16. On-going Cooperation and Additional Documents.  All parties to this Agreement agree to cooperate fully and execute any and all necessary supplementary documents and to take all additional actions which may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement, including documents relating to dismissal of the aforementioned lawsuit.

17. Authority.   Each of the undersigned signatories hereby represents and warrants that he or she has the authority to bind the entity on whose behalf he or she is signing this Agreement.

IN WITNESS WHEREOF, this Settlement Agreement has been duly executed by the Parties hereto on the dates appearing below.

Owner:
Voltage Pictures, LLC


_____          Date:     _____
By: Carl D. Crowell, Esq.
Attorney for Voltage Pictures, LLC


Subscriber:


_____          Date:     _____
Mary Havlicek
Tel: _____